## WAIVER BY INDORSER OF NOTICE OF DISHONOR.

Court of Appeals for Scioto County.

ELIZABETH EVANS, AS EXECUTRIX OF THE LAST WILL AND TESTA-
MENT OF NELSON W. EVANS, DECEASED, v. KATE
COMINS AND ALICE COMINS.

Decided, December 18, 1914.

*Promissory Notes—Implied Promise by Indorser to Collect Notes—
Holders Relieved from Making Demand and Giving Notice of
Dishonor.*

1. An indorser of a negotiable instrument who, before the time for
   presentment, agrees with the holder that he will collect the
   principal sum evidenced by said instrument and the interest due
   thereon, thereby waives notice of dishonor.
2. An indorser of a negotiable instrument who, for eight or ten years
   has sold and delivered such instruments to the holders and has
   always collected the principal and interest due thereon, can not
   take advantage of the failure of such holders to make demand and
   give notice of dishonor to him, after such course of conduct, al-
   though he did not expressly agree to undertake the collection of
   the note in controversy.

*E. G. Millar* and *Jos. T. Micklethwaite*, for plaintiff in error.
*Blair & Kimball*, contra.

Error to the Court of Common Pleas of Scioto County, Ohio.

August 3, 1911, Hester Ann Copeland and Arthur J. Copeland
executed and delivered to Nelson W. Evans their five promissory
notes, for $500 each, payable to him one year after date. Be-
fore the end of August, 1911, Nelson W. Evans, for a full
and valuable consideration, sold and delivered two of the notes
to Alice and Kate Comins, and signed his name on the back
of each note. The notes contained no waiver of protest. Pre-
sentment for payment was never made or attempted, and notice
of dishonor was never given to the indorser, Nelson W. Evans,
who died May 27, 1913. Kate and Alice Comins claim that
notice of dishonor was waived by the indorser, as appears by

the testimony of their mother, which was undisputed and is as follows:

"Q.   State your name, age, and residence?   A. Ann Comins; aged 85; No. 1148 Gallia street, Portsmouth, Ohio.

"Q.   Were you acquainted with Captain N. W. Evans during his lifetime?  A. Yes, I have known him for 35 years; probably longer.

"Q.   How close did you live to him?   A. Next door but one for about the past eight years.   We have always been friendly.

"Q.   Did he come to your house; and if so, how frequently during that time?   A. He came nearly every week or so.

"Q.   What relation are you to Alice and Kate Comins?   A. Their mother.

"Q.   Did Captain Evans and your two daughters, Alice and Kate, have any business transactions together?   A. Yes; we used to think that whatever Mr. Evans did was all right.

"Q.   What were these business transactions?   A. He would bring notes to them and sell them to them, and attend to collecting the interest and the notes.

"Q.   Did the girls look after any of these notes that he sold them, or did Captain Evans?   A. They let him have the care of them, always.

"Q.   Do you know whether or not that he let them have a couple of notes given by Hester Ann Copeland and Arthur J. Copeland, dated August 3, 1911, for $500 each?   A. I think I heard him talking about these notes, and he told them that they were on a farm and that they were as good as gold.

"Q.   Was there anything said about who would look after these notes?   A. He said he would look after them.

"Q.   I'll ask you whether or not he did bring any interest here on the notes?   A. I think he did.

"Q.   How long were these business transactions about the notes between Captain Evans and the girls?   How long back was he indorsing these notes, collecting the interest and looking after them for the girls?   A. As much as eight or ten years, probably more than that.

"Q.   How near to the time of his death was he over here, talking about the Copeland notes?   A. Not longer than three or four weeks before his death.

"Q.   What did he say the last time he was over here, talking about the Copeland notes?   A. He said they were on a farm, and that they were as good as gold, and I asked him who this Copeland was.   He said, 'He is a farmer, and as good as gold,' and he says, 'I'll attend to them and look after the notes.'

"Q. Did the girls ever look after any notes that Captain Evans ever indorsed to them? A. He did all the collecting.

"Q. Where would he give them the money? A. Here at the house, and some he sent by check through the mail.

"Q. Did the people that these notes are on, did the girls go and see them? A. I don't think they did. We always had confidence, we never questioned. Captain Evans looked after it.

"Q. You have said that they were dealing in notes with him for the past eight or ten years. I'll ask you that if during that entire time they held notes that he had sold them? A. Yes.

"Q. Is it or is not a fact that he had practically entire charge of their money in this way? A. Nearly all of it."

The Court of Common Pleas of Scioto County held that notice of dishonor was waived.

SAYRE, J.; WALTERS, J., and JONES, J., concur.

Section 8214 provides that notice of dishonor may be waived expressly or by implication.

Waiver of demand and notice must be clearly shown. *Second National Bank of Cleveland* v. *McGuire*, 33 O. S., 295.

The necessity to give notice of dishonor is dispensed with by such conduct on the part of the indorser toward the holder of negotiable paper as is calculated to put a person of reasonable prudence off his guard or to induce him to omit to give such notice. *Boyd* v. *Bank of Toledo*, 32 O. S., 526.

It appears from the testimony that Nelson W. Evans, for several years, had been selling notes to Kate and Alice Comins and attending to the collection of the principal and interest, and that he said he would look after these particular notes. However, it does not clearly appear, when he said he would look after the Copeland notes, whether it was before maturity or afterward, as the last conversation in which he said he would look after them was some time after the notes were due. It is not clear that Nelson W. Evans, before the time when demand and notice should have been given, agreed to look after the collection of these particular notes; but from the long course of similar transactions, in negotiating notes to Kate and Alice Comins and collecting the principal and interest, they clearly

had a right to expect that he would undertake the collection of
the Copeland notes. By such conduct, and without notice to the
contrary, he did undertake to "look after the notes." His
promise to collect the notes is clearly implied from the situation
of the parties, as shown by the evidence of Ann Comins. He
thereby took upon himself the duty of collecting the notes, which
included the duty to take the necessary steps required by law to
make an indorser liable. He thereby relieved the holders from
the duty to make demand and give notice of dishonor. It be-
came his duty to do what the law required Kate and Alice
Comins to do, that is, to make demand and give notice of dis-
honor. If he had made demand, as he was bound to do under
his arrangement with them, he would have had notice of dis-
honor. If he did not receive such notice it was because he did
not do his duty. So that neither he, nor his estate, could take
advantage of his failure to do his duty. By taking upon him-
self the duty to collect the notes he clearly waived notice of dis-
honor. *Torbert* v. *Montague* (Cal.), 87 P., 1145; *Bryant* v. *Wil-
cox,* 49 Cal., 47.

The judgment will be affirmed.